UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,              :
                                                    :

              -against-                   :
                                                    :

YEVSEY LEKHTMAN,                    :          **MEMORANDUM & ORDER**
      also known as                :
      "Eugene Lekhtman,"        :             08-CR-508 (DLI)
SIMON BENIMETSKY,               :
ROMAN DUDKIN, AND             :
YELENA RAYKHMAN,              :
      also known as                :
      "Yelena Lekhtman,"         :
                                                      :
                       Defendants.     :
----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

On August 14, 2008, defendants Yevsey Lekhtman, Simon Benimetsky,[1] Roman Dudkin

and Yelena Raykhman were named in a five-count superseding indictment ("Indictment"),[2]

charging: (1) conspiracy to embezzle, steal and obtain by fraud and materially false statements

funds provided and insured under Subchapter IV of Title 20 of the United States Code, in

violation of 20 U.S.C. § 1097(a) ("student aid fraud conspiracy"); (2) a substantive count of

fraud in violation of 20 U.S.C. § 1097(a) ("student aid fraud"); (3) theft of public money from

the United States Department of Education ("DOE") in violation of 18 U.S.C. § 641 ("theft of

DOE funds"); (4) conspiracy to obtain visas by submitting false documents to the Immigration

and Naturalization Service and Department of Labor ("DOL") in violation of 18 U.S.C. § 1546

("visa fraud conspiracy"); and (5) theft of public money from the United States Department of

Labor, in violation of 18 U.S.C. § 641 ("theft of DOL funds"). Defendants Lekhtman,

---

[1] Defendant Benimetsky remains a fugitive from justice.

[2] The original indictment identified Benimetsky as "Lyubov Benimetskaya." The superseding indictment identifies the Benimetsky solely as "Simon Benimetsky."

Raykhman, and Dudkin were charged in counts one through three; Lekhtman, Dudkin, and Benimetsky were charged in count four; and Lekhtman and Raykhman were charged in count five.

On September 8, 2009, Lekhtman and Raykhman filed an Omnibus Pre-trial Motion ("Omnibus Motion") requesting that the court: (1) suppress all evidence seized pursuant to the execution of a DOL search warrant ("2003 DOL warrant") or, in the alternative, order disclosure of all student academic, attendance, financial aid, and enrollment records ("student records") seized thereunder; (2) suppress all evidence seized pursuant to the execution of a DOE search warrant ("2004 DOE warrant") or, in the alternative, order disclosure of all the student records seized thereunder; (3) compel the government to provide defendants with a bill of particulars; (4) compel the government to produce all evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972); (5) suppress any hearsay statements of non-testifying co-defendants that incriminate them pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), or, in the alternative, sever co-defendant Dudkin from this case; and (6) sever the visa fraud conspiracy count of the Indictment or, in the alterative, sever Raykhman from this case.

On November 17, 2009, the court heard oral argument on the Omnibus Motion and made the following rulings on the record: (1) the court, in large part, denied the defendants' request for a bill of particulars, and granted it, in part by directing the government to provide the defendants, on a rolling basis, with a list of students whose financial aid applications and/or disbursements underlie the allegations the government will seek to prove at trial; (2) regarding *Brady*, the government was: (a) ordered to turn over the interview notes of the four students who had previously been identified as providing information arguably favorable to the defendants, (b)

reminded that *Brady* material is to be turned over as it is discovered, and (c) ordered to turn over *Giglio* material within its possession two weeks before the commencement of trial; and (3) in order to address any potential *Bruton* concerns, the government was directed to submit with its forthcoming motions in limine a redacted version of co-defendant Dudkin's statements that it will seek to introduce at trial.

The issues that remain ripe for the court's consideration are: (1) whether the items seized pursuant to 2003 DOL and 2004 DOE warrants should be suppressed; (2) whether information favorable to the defense in the possession of the Council on Occupational Education ("COE") must be produced by the government pursuant to its *Brady* obligations; and (3) whether the visa fraud count should be severed from this case, or, alternatively, whether Raykhman should be severed.

For the following reasons, defendants' motions are denied in their entirety.

## **BACKGROUND**

The charges in the Indictment relate to a not-for-profit vocational training school, Centurion Professional Training ("Centurion" or "the school"), located in Brooklyn, New York. The school was established in 1998 by defendant Lekhtman to provide business and computer training courses. (Superseding Indictment dated August 14, 2008 ("Indict.") ¶ 9; Koenig Decl. ¶ 4–5.) Defendants Yelena Raykhman and Roman Dudkin were employed at Centurion.

Centurion participated in two governmental financial aid programs: the federal Pell Grant Program and the New York State Tuition Assistance Program ("TAP"). The federal Pell Grant Program, administered and funded by the DOE, provided financial aid grants for eligible students to help them pay for post-secondary education. The Pell Grants were transmitted directly to the educational institution in which the students were enrolled, and did not need to be

3

repaid by the student. (Indict. ¶ 1.) In order to participate in the Pell Grant program, an institution was required to be accredited or approved by an appropriate agency,[3] and offer a program leading to an academic or professional degree, vocational certificate or other recognized educational credential. (*Id.* ¶ 2.) The institution also had to enter into a Program Participation Agreement with the DOE. The Program Participation Agreement conditioned participation on an institution's compliance with all applicable laws and regulations. Participating institutions were required to document student attendance and ensure that a student receiving a Pell Grant was enrolled in, and attending, an eligible program. (*Id.* ¶ 2.) Once the amount of a student's Pell Grant was determined, the educational institution applied for disbursement of funds from the DOE, and drew down the disbursed funds in stages during the academic year. (*Id.* ¶ 4.) Institutions were required to promptly refund Pell Grants to the DOE for students who withdrew from school. (*Id.* ¶ 5.)

The TAP Program, administered by the New York State Higher Education Services Corporation ("NYHESC"), is a state program providing need-based grants to eligible post-secondary students that the students do not need to repay. (*Id.* ¶¶ 6, 8.) The TAP program is partially funded by the DOE. (*Id.* ¶ 6.) Like the federal Pell Grant program, in order for an institution to participate in the TAP program, the institution was required to obtain accreditation or approval by an appropriate agency, and offer a program leading to a recognized educational credential. In addition, the institution had to enter into an Agreement to Participate with the

---

[3] The Council on Occupational Education is one such agency. *See* U.S. Department of Education List of Regional and National Institutional Accrediting Agencies, *available at* http://www.ed.gov/admins/finaid/accred/accreditation_pg7.html#RegionalInstitutional. The COE granted Centurion candidacy accreditation status in November 2002, and full accreditation status in June 2004. (Koenig Decl. ¶¶ 9–10.)

NYSHESC. (*Id.* ¶ 7.) Only students enrolled in and attending an eligible program at a participating institution were eligible to receive TAP grants. (*Id.* ¶ 8.)

In October 2002, Centurion entered into a Program Participation Agreement with the NYHESC that enabled it to participate in the TAP program. (*Id.* ¶ 12.) On March 17, 2003, the DOE certified Centurion as eligible to participate in financial aid programs, including the Pell Grant Program, for eligible students in its Computer Programming/Client Server Technology Program (Koenig Decl. ¶ 11 & Ex. C). On March 27, 2003, Centurion entered into a Program Participation Agreement with the DOE, enabling it to participate in the Pell Grant Program. (Koenig Decl. ¶ 13 & Ex. C; Indict. ¶ 12.) On May 29, 2003, Centurion received approval from the DOE to receive Pell funds for its Business Office Management Program. (Koenig Decl. ¶ 14 & Ex. C.)

On November 6, 2003, agents from the DOL executed a search warrant at Centurion. According to the 2003 DOL warrant's supporting affidavit, the warrant was obtained pursuant to a DOL investigation into allegations that Centurion had fraudulently obtained federal funds provided under the Workforce Investment Act of 1998 ("WIA"), and fraudulently sponsored individuals for H1B1 work visas. (Koenig Decl. Ex. D ("2003 Aff.").) The execution of the warrant resulted in the seizure of over 38,000 pages of documents, including all the student academic, attendance, financial aid, and enrollment records Centurion was required to maintain as a TAP and Pell fund recipient. (Omnibus Motion at 7.)

On October 20, 2004, another warrant was executed at Centurion, this time by agents from the DOE. The warrant was obtained pursuant to an independent DOE investigation into allegations that Centurion had, *inter alia*, falsified its students' records in order to fraudulently obtain student aid funding. (Koenig Decl. Ex. G ("2004 Aff.").) The execution of this warrant

resulted in the seizure of thirty-eight boxes of paper documents, as well as computer hard drives and other electronic storage media. (Omnibus Motion at 9; Koenig Decl. Ex. I.)

On August 14, 2008, the government obtained a five-count superseding indictment against the defendants, charging: (1) student aid fraud conspiracy; (2) student aid fraud; (3) theft of DOE funds; (4) visa fraud conspiracy; and (5) theft of DOL funds. The Indictment alleges, among other things, that defendants Lekhtman, Raykhman and Dudkin fraudulently obtained TAP and Pell funds by: (1) causing Pell funds to be drawn down for students who were not enrolled in and attending eligible courses at Centurion; (2) falsifying student attendance records and enrollment agreements by adding false attendance hours and courses to student files; (3) altering enrollment agreements; and (4) manipulating and falsifying other student records to make it appear that students were enrolled in and attending eligible programs at Centurion when in fact they were not. (Indict. ¶¶ 15–16.) The Indictment further alleges that defendants Lekhtman, Dudkin and Benimetsky conspired to submit false and fraudulent statements to the Immigration and Naturalization Service and DOL, claiming that Centurion sought to hire individuals as, *inter alia*, a computer software engineer and a communications analyst, while making false and fraudulent statements regarding: (1) the qualifications of the visa applicants; (2) the wages that the visa applicants would earn; (3) the duties that the visa applicants would perform; and (4) the location where the visa applicants would work. (*Id.* ¶¶ 22–27.)

On September 8, 2009, defendants filed their Omnibus Motion. On October 10, 2009, this case was reassigned to the undersigned from the late Honorable Charles P. Sifton, U.S. District Judge. The court heard oral argument on the Omnibus Motion on November 18, 2009 and, as set

forth above, ruled on certain issues on the record. The trial on the Indictment[4] is currently scheduled to begin on February 1, 2010.

## DISCUSSION

### I.      Suppression of the Seized Items

The defendants move to suppress: (1) all evidence obtained pursuant to the 2003 DOL warrant or, in the alternative, seek disclosure of all the student records seized thereunder; and (2) all evidence obtained pursuant to the 2004 DOE warrant or, in the alternative, seek disclosure of all the student records seized thereunder. For the reasons set forth below, suppression is denied in all respects.

### A.      The 2003 DOL Warrant

Agents executing a search warrant are bound by the warrant's scope. *See Horton v. California*, 496 U.S. 128, 140 (1990) (noting that the scope of the search must be within "that permitted by the terms of a validly issued warrant"). In interpreting a warrant's scope, however, agents "have some discretion" and their interpretation should be "commonsensical," not "hyper-technical." *United States v. Salameh*, 54 F. Supp. 2d 236, 277 (S.D.N.Y. 1999), *aff'd*, 16 Fed. Appx. 73 (2d Cir. 2001); *see also United States v. Catapano*, 2008 WL 3992303, at *3 (E.D.N.Y. Aug. 28, 2008) (noting that a broad interpretation of a search warrant as directed by *Salameh* is proper and has the benefit of "providing the agents with the discretion necessary to reasonably conduct a search involving fraud" and other crimes). Accordingly, whether agents

---

[4] At the November 18, 2009 oral argument, the court was notified of the government's intent to file a second superseding indictment adding a forfeiture allegation and charging the defendants with aggravated identity theft. (Oral Argument Tr. at 37.) The court set a deadline of December 8, 2009 by which the government had to file its forthcoming second superseding indictment. The government was also informed that failure to comply with this deadline would cause the trial scheduled for February 1, 2010 to proceed on the superseding indictment of August 14, 2008. (Oral Argument Tr. at 38-40; Docket Entry 59.)

properly seized items pursuant to a search warrant is necessarily a fact-specific inquiry involving a reasonable comparison of the warrant's terms to the items seized.

Nevertheless, "suppression of all evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (citations omitted). "Government agents flagrantly disregard the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal citations and quotation marks omitted). Defendants claim that the seizure of student academic, attendance, financial aid, and enrollment records amounts to a flagrant disregard of the 2003 DOL warrant's terms, thereby requiring the suppression of all the items seized pursuant to that warrant. As set forth in more detail below, the student records fell within a reasonable and commonsensical interpretation of the 2003 DOL warrant's terms, and therefore, suppression (complete or otherwise) is unwarranted.

The probable cause underlying the issuance of the 2003 DOL warrant was based, in part, on an alleged scheme to fraudulently obtain federal funds provided under the Workforce Investment Act. The distribution of WIA funds is coordinated by state and local governments through various "One-Stop Centers." (Koenig Decl. Ex. D. ¶ 7.) The New York Association for New Americans ("NYANA") is a One-Stop Center under contract with the City of New York Human Resources Administration ("HRA") to assist in the distribution of WIA funds. (*Id.* ¶ 8.) In order to obtain WIA funds for one of its students, a vendor (*i.e.*, Centurion) would complete and file a WIA Individual Training Application with NYANA. (*Id.* ¶ 9.) Case managers at NYANA were tasked with verifying that WIA funds were authorized for disbursement via WIA

payment vouchers. (*Id.* ¶ 10–13.) Once authorization was verified, WIA funds would be dispersed as percentages of total tuition cost, at various stages of course completion. (*Id.* ¶ 9.) The case managers were under a continuing duty to monitor the progress of aid recipients and to ensure the propriety of the continued WIA voucher disbursements. (*Id.* ¶ 10.) According to the affidavit filed in support of the 2003 DOL warrant, Lekhtman and Centurion fraudulently obtained WIA funding through, among other means, the submission of fraudulent documents to support issuance of the WIA vouchers, and the bribery of Bianka Veret, a case manager at NYANA, so that Veret would not properly monitor the issuance of the vouchers. (*Id.* ¶ 12–13.)

The 2003 DOL warrant authorized the seizure of, among other things: "[a]ny and all documents, books, records, financial statements and supporting documents . . . relating to" WIA vouchers. (Koenig Decl. Ex. E.) The student records were "related" to the WIA vouchers because they were relevant to proving that the vouchers were fraudulently obtained. For example, in order to remain eligible for the continued disbursement of WIA funds, students had to meet certain training benchmarks throughout the course of their studies. (2003 Aff. ¶¶ 8, 10.) Notably, for Centurion to remain eligible for WIA funds, it also had to submit program-specific performance information showing, among other things, program completion rates and information on program costs (*e.g.*, tuition and fees). *See* 29 U.S.C. 2842(d). The 2003 DOL warrant also authorized the seizure of "any . . . records relating to the preparation of" WIA materials. (Koenig Decl. Ex. E.) The student records were relevant to the program information that Centurion was required to prepare and submit to appropriate regulatory agencies, and were also authorized for seizure on this basis. Thus, the student academic, attendance and enrollment records were necessary to prove the allegation that Veret had not monitored the aid-receiving students' progress at Centurion.

Students were also ineligible for WIA funds if their financial needs were met by other funding sources, such as Pell grants and other state-based funding. *See* 20 C.F.R. 663.320 ("Training providers must consider the availability of other sources of grants to pay for training costs such as . . . State-funded training funds, and Federal Pell Grants, so that WIA funds supplement other sources of training grants."). Therefore, the student financial aid records were relevant to proving the alleged fraud because they were necessary to determine whether students were receiving funding that would disqualify them from receiving WIA vouchers. Accordingly, defendants' argument is meritless; the student records fell within a reasonable interpretation of the 2003 DOL warrant's terms.

B.      The 2004 DOE Warrant

Defendants also move for the suppression of all the evidence seized pursuant to the 2004 DOE warrant on the grounds that the probable cause supporting its issuance was based on fruits of the illegally-executed 2003 DOL warrant (*i.e.*, the student records). However, as discussed above, the student records were properly seized, and therefore, the defendants' fruit of the poisonous tree argument is baseless. In any event, even assuming *arguendo* that the student records were impermissibly seized, suppression of all the items seized pursuant to the execution of the 2004 DOE warrant would not be warranted.

There is no indication in the record that the 2004 DOE warrant was premised upon the fruits of the 2003 DOL warrant, and therefore, this argument is based upon nothing more than defendants' conjecture. The affidavit filed in support of the 2004 DOE warrant makes absolutely no mention of the 2003 DOL search or any records seized pursuant to the search. In fact, the probable cause supporting the issuance of the 2004 DOE warrant appears to have developed through a wholly independent investigation, finding its genesis in a complaint made by a

Centurion student to the New York State Education Department ("NYSED") in July 2003, before the 2003 DOL warrant was executed. (2004 Aff. ¶ 15.) Thereafter, NYSED initiated an investigation that led to the discovery of false student enrollment agreements at Centurion in October 2003, also before the 2003 DOL warrant was executed. (*Id.* ¶ 16–17.) Indeed, it appears that the DOE did not begin its own investigation into Centurion's activities until after it received information from the NYSED in March 2004 about Centurion's purported attempt to falsify records in an attempt to "deceive NYSED investigators, limit financial liabilities, and maintain their participation in federal and state financial assistance programs." (*Id.* ¶ 18.) Accordingly, even if the student records were illegally seized, the items seized pursuant to the execution of the 2004 DOE warrant would not be suppressed,[5] and therefore, the motion to suppress or to disclose is denied.

## II.    *Brady* Materials

Defendants argue that the government's *Brady* obligations extend to information in the possession of the COE, a national accrediting agency that granted Centurion candidacy accreditation status. (Koenig Decl. ¶¶ 9–10.) The government counters that its *Brady* "obligations extend only to information in its files or in the possession of other government agencies that act on the government's behalf in investigating or prosecuting a particular case." (Gov'ts Opp'n at 18.)

To constitute a violation of *Brady*, information must be "known to the prosecution, but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). Thus, the prosecution is not required to disclose information of which it is unaware. *United States v. Tillem*, 906 F.2d

---

[5] Contrary to defendants' contention, the mere fact that evidence obtained pursuant to the 2003 DOL and 2004 DOE warrants is being used in the same case is not dispositive, or even material, as to whether the items seized pursuant to the 2004 DOE warrant are tainted fruit of the 2003 DOL warrant.

814, 824 (2d Cir. 1990). However, the Supreme Court has held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case . . . ." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Thus, "a prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him—those variously referred to as an 'arm of the prosecutor' or part of the 'prosecution team.'" *United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005) (citing *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).

Defendants cite no caselaw that would support the extension of the prosecution's *Brady* obligations to information in the possession of the COE, a not-for-profit, private accrediting organization. Moreover, nothing in the record indicates that the COE investigated defendants or Centurion on behalf of the prosecution, or that it was in any way involved with the prosecution's case. *See Bin Laden*, 397 F. Supp. 2d at 481–82 ("At one end of the spectrum, it is clear that the investigating case agents on a particular prosecution are part of the prosecution team; their possession of producible material is imputed to the prosecutor regardless of his actual knowledge. . . . At the other end of the spectrum, government agents of a separate sovereign who are wholly uninvolved in the investigation being prosecuted are clearly not part of the prosecution team."). Accordingly, the government has no duty to learn of any favorable evidence known to the COE. The appropriate avenue for obtaining such evidence, to the extent it exists, is by subpoena pursuant to Federal Rule of Criminal Procedure 17(c).

## III. Severance

Defendants jointly seek to sever the visa fraud conspiracy count or, in the alternative, Raykhman moves to be severed as she is the only defendant not charged with that count.

Federal Rule of Criminal Procedure 14(a) allows the court to "order separate trials of counts, [or] sever the defendants' trials" if it appears that a defendant is prejudiced by the joinder. That decision is within the "sound discretion" of the district court. *United States v. Lasanta*, 978 F.2d 1300, 1306 (2d Cir. 1992). "There is a preference in the federal system for joint trials of defendants who are indicted together" because, in general, they promote efficiency and serve the interests of justice. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also United States v. Cardascia*, 951 F.2d 474, 483 (2d. Cir. 1991) (noting that the risk of some slight prejudice to codefendants is deemed outweighed by concerns for judicial economy, the risk of inconsistent verdicts resulting from separate trials, and the favorable position that later-tried defendants obtain from familiarity with the prosecution's strategy). In order to succeed on a motion for severance, a defendant must show that the prejudice from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998); *see also United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) ("in order to prevail, the defendant must show not simply some prejudice but substantial prejudice") (internal quotation marks and citation omitted).

## A.     Severance of the Visa Fraud Conspiracy Count

In support of severance, defendants argue in a conclusory fashion that they will be prejudiced because the immigration issues related to the visa fraud conspiracy count are politically and emotionally charged and, therefore, the jury will be unable to fairly determine defendants' guilt on the remaining counts. These concerns are entirely speculative. Nevertheless, these concerns can be satisfactorily addressed by an instruction to the jury that each defendant must be considered separately as to each count in which s/he is named, and that neither the

nature of the visa fraud conspiracy count, nor the evidence related solely to that count, has any bearing on a defendant's guilt as to the remaining counts. *See United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (noting that even in situations where the risk of prejudice is high, less drastic measures, such as limiting instructions, often suffice). It is well settled that juries are presumed to be capable of following a judge's instructions in sorting out what evidence bears on the guilt of any single defendant. *See Zafiro*, 506 U.S. at 540 (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). The court finds that such instructions are sufficient to address the purported prejudice, and therefore, severance is unnecessary.

Proceeding with a joint trial is especially appropriate in the case at bar because all of the counts charged against the defendants were allegedly perpetrated in similar fashion (*i.e.*, by the submission of fraudulent documents to the United States government) and allegedly arise out of an overall scheme or plan of significant fraudulent activity related to Centurion (and other entities operating out of the same location). *See United States v. Girard*, 601 F.2d 69, 72 (2d Cir. 1979) ("Where, as here, the crime charged involves a common scheme or plan, a joint trial of the participants is proper, absent a clear showing of prejudice.") (citations omitted). Additionally, it is evident that there will be a substantial overlap between the witnesses and documents presented in furtherance of proving the visa fraud conspiracy count and the remaining counts. Thus, judicial economy would be greatly facilitated by having the counts litigated in a single proceeding rather than multiple proceedings. Accordingly, defendants' motion to sever the visa fraud conspiracy count is denied. Defendants have failed to make a showing that purported prejudice is sufficiently severe to outweigh the judicial economy that would be realized by a single trial.

**B.  Severance of Defendant Raykhman**

Defendant Raykhman alleges that because she is the only defendant who is not charged with the visa fraud conspiracy, a joint trial would be highly prejudicial to her right to a fair trial and would prevent the jury from reaching a fair verdict on the charges against her. Raykhman again relies on the allegedly inflammatory nature of the visa fraud evidence to justify severance. As noted above, defendant's argument that the nature of the visa fraud conspiracy will cause prejudice is entirely speculative, and, in any event, any prejudice can be cured by a limiting instruction. The jury will be instructed that: (1) it must give separate consideration to each individual defendant; (2) it must separately consider each charge against each individual defendant; and (3) each individual defendant is entitled to have his or her case determined from his or her own conduct and the evidence applicable to him or to her. *Zafiro*, 506 U.S. at 541. Moreover, ordering the severance of Raykhman would: (1) constitute a significant duplication of court resources; (2) require witnesses to repeat the inconvenience of testifying; and (3) possibly favor Raykhman by affording her the advantage of knowing the prosecution's case beforehand. Accordingly, judicial economy favors a joint trial and Raykhman's severance motion is denied.

## CONCLUSION

For the reasons set forth above, defendants' remaining motions are denied in their entirety.


SO ORDERED.

Dated: Brooklyn, New York
       December 15, 2009

/s/
_____
DORA L. IRIZARRY
United States District Judge
